## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                              Crim. No. 07-181 (PJS/SRN)

       Plaintiff,

      v.                                    <u>REPORT AND RECOMMENDATION</u>

Victor Manuel Molina-Tepozteco,

       Defendant.

---

    LeeAnn Bell, Office of the United States Attorney, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff United States of America

    Andrew Mohring, Office of the Federal Defender, 300 South Fourth Street, Suite 107, Minneapolis, Minnesota 55415, for Defendant Victor Manuel Molina-Tepozteco

---

SUSAN RICHARD NELSON, United States Magistrate Judge

    The above-captioned case comes before the undersigned United States Magistrate Judge on Defendant Victor Manuel Molina-Tepozteco's Motion to Suppress Evidence Obtained as a Result of May 16, 2007 Search (Doc. No. 27) and Motion to Suppress May 16, 2007 Statements (Doc. No. 28). This case has been referred to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.[1]

## I.    BACKGROUND

    An Indictment was filed on June 5, 2007, charging Defendant Victor Manuel Molina-Tepozteco ("Defendant") with one count of being an illegal alien in possession of a firearm. This Court

---

[1] The Court will address Defendant's non-dispositive motions in a separate Order.

held a pretrial motions hearing on September 11, 2007.  Bureau of Immigration and Customs

Enforcement (ICE) Special Agent Paul Nichols testified at the hearing, and the Court received the

following exhibits into evidence:

> Gov't Ex. 1:   an advisement of rights and waiver form, signed by Defendant on May 16,
>
> 2007; and
>
> Gov't Ex. 2:   an application, affidavit, and search warrant for 3925 Clinton Avenue South in
>
> Minneapolis, Minnesota.

## II.    FACTS

The following facts were elicited from Special Agent Nichols' testimony at the pretrial motions

hearing and from the Government's exhibits.  On May 10, 2007, Deputy Douglas Schmidtke applied

for a search warrant for the premises of 3925 Clinton Avenue South in Minneapolis, Minnesota.

Deputy Schmidtke listed various controlled substances, paraphernalia, paperwork, and money as the

targets of the search.  In his supporting affidavit, Deputy Schmidtke described information he had

received from a confidential reliable informant (CRI).  The CRI said that a Hispanic man named Victor

lived at 3925 Clinton Avenue South and sold large amounts of cocaine and marijuana from the upstairs

apartment.  The CRI also said that Victor possessed a handgun and two assault rifles, that Victor was a

member of a Mexican gang, and that Victor was an illegal alien.  In the seventy-two hours preceding

the application for the warrant, the CRI participated in a controlled buy of cocaine from Defendant at

the Clinton Avenue address.  A Hennepin County District Court Judge signed the warrant on May 10,

2007.

Law enforcement officers executed the warrant on May 16, 2007, between 9:00 and 11:00

a.m.  A SWAT team made the initial entry into the residence and secured the premises.  Special Agent

Nichols and other task force members then entered the apartment to conduct the search.  As an ICE

agent, Special Agent Nichols focuses on immigration violations and transnational gangs.  His

participation in executing the warrant was based on law enforcement's belief that illegal aliens were

involved in the narcotics trafficking and that weapons were also involved.  Special Agent Nichols knew

prior to entering the residence that an assault rifle and other firearms were possibly located inside, and

he knew it was a federal crime for an illegal alien to possess a firearm.

When Special Agent Nichols entered the residence, he encountered Defendant and two women

in the living room, all of whom were restrained with flex-cuffs.  Special Agent Nichols searched a sofa

in the room for weapons, and finding none, allowed the three individuals to sit on the sofa while he

briefly questioned them.  Special Agent Nichols did not advise the individuals of their Miranda rights

before or during questioning.

Special Agent Nichols first asked some biographical questions to determine the individuals'

alienage and deportability.  He also asked Defendant if there were any guns in the house that he should

know about.  Defendant said there was a gun, and he offered to show it to the agent.  Special Agent

Nichols testified that he asked Defendant about guns because that was the purpose of the search

warrant,[2] and for officer safety.  He further testified that a gun could discharge if an officer accidentally

touched it during a search and that homemade guns can be unstable.  Defendant showed the gun, which

---

[2] In fact, the search warrant does not mention guns or any other weapons.  The warrant is limited to controlled substances, related paraphernalia, items showing constructive possession of controlled substances, instrumentalities used in the sale of controlled substances, money, receipts, and records.  (Gov't Ex. 2.)

was located on a closet shelf, to Special Agent Nichols.  Defendant was then transported to jail.

Later that day, Special Agent Nichols interviewed Defendant at the jail.  Special Agent Nichols first showed Defendant a <u>Miranda</u> advisory form, which was in Spanish.  Defendant took the form and read it.  Special Agent Nichols asked Defendant if he understood his rights, and Defendant said yes.  Defendant then initialed at the top of the page and signed his name at the bottom, waiving his <u>Miranda</u> rights.  The interview lasted about thirty minutes and covered topics such as biographical information, prior immigration history, prior arrests, gang membership, and details about the gun that had been recovered at the residence.  Special Agent Nichols also discussed the immigration violations and criminal charges that Defendant was facing.

## III.    DISCUSSION

Defendant moves to suppress the evidence seized pursuant to the search warrant.  At the hearing, he clarified that he is not challenging the execution of the warrant, only the warrant's "facial validity."  Defendant also disclaimed any intention to seek suppression of the gun.  Defendant also moves to suppress both statements he made on May 16, 2007.  The Government explained at the hearing that it was seeking to introduce Defendant's statement at the apartment in response to the question about the gun, as well as Defendant's statement at the jail, but not Defendant's responses to the biographical questions asked at the apartment.

### 1.    The Search Warrant

Defendant moves to suppress evidence seized pursuant to the search warrant.  At the hearing, he characterized his challenge to the warrant as a challenge to its "facial validity," but this term is usually associated with an analysis of the good faith exception to the exclusionary rule under <u>United States v.</u>

Leon, 468 U.S. 897 (1984).  This issue is not present here.  The Court will assume that Defendant is

challenging the existence of probable cause, as that is the basis for his written motion.

When an issuing court relies solely on an affidavit to determine whether probable cause exists

for a warrant, the reviewing court may consider "only that information which is found within the four

corners of the affidavit . . . in determining the existence of probable cause."  United States v. Leichtling,

684 F.2d 553, 555 (8th Cir. 1982).  Upon reviewing the affidavit in the present case, the Court finds

that it established probable cause for the warrant.  The affidavit recounted the investigation in detail,

including the controlled buy of cocaine from Defendant at 3925 Clinton Avenue South only a few days

before.  The information set forth in the affidavit was more than sufficient to support the issuing judge's

determination that probable cause existed to search the apartment.  See Illinois v. Gates, 462 U.S. 213,

238-39 (1983).  Defendant's motion to suppress evidence seized pursuant to the search warrant should

be denied.

### 2.  Defendant's Statement to Special Agent Nichols at the Apartment

The Fifth Amendment privilege against self-incrimination protects individuals from being forced

to testify against themselves.  U.S. Const. amend. V.  Law enforcement officers must warn a person of

the rights subsumed in the privilege against self-incrimination before interrogating that person in a

custodial setting.  Miranda v. Arizona, 384 U.S. 436, 460-61 (1966).

An "interrogation" is not just express questioning, but also "any words or actions on the part of

the police . . . that the police should know are reasonably likely to elicit an incriminating response from

the suspect."  Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  Here, Special Agent Nichols should

have known that the question about the existence of any guns was reasonably likely to elicit an

incriminating response.  His participation in the search that day was based on his beliefs that illegal aliens were involved in the narcotics trafficking and that guns were possibly located in the apartment. Furthermore, Special Agent Nichols knew that it was a criminal offense for an illegal alien to possess a firearm.  Under these circumstances, Special Agent Nichols should have known that the question about the existence of any guns was reasonably likely to elicit an incriminating answer from Defendant.  The question therefore constituted interrogation.

The next issue is whether Defendant was in custody at the time of the interrogation.  The "determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." Stansbury v. California, 511 U.S. 318, 323 (1994).  Rather, the "relevant inquiry is how a reasonable man in the suspect's position would have understood his situation."  Berkemer v. McCarty, 468 U.S. 420, 442 (1984).  The test is whether a reasonable man in Defendant's position would have believed that his "freedom of action [was] curtailed to a 'degree associated with formal arrest.'"  Id. at 440 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)).  The Eighth Circuit has identified several "indicia of custody" to aid courts in determining whether a Miranda warning was required:

> (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990).

Although the Government declined to concede the issue of custody at the motion hearing, it acknowledged that the Court would likely find that Defendant was in custody when Special Agent Nichols asked him about the existence of any guns.  Indeed, the Court does find that the setting was custodial.  Special Agent Nichols did not inform Defendant that the questioning was voluntary or that he could leave.  Defendant was restrained with flex-cuffs and confined to sitting on a couch.  Defendant was arrested at the end of the questioning and transported to jail.  Numerous SWAT team members and other officers executing the warrant were present, controlling and dominating the atmosphere inside the apartment.  These four factors strongly favor a finding that Defendant was in custody.  Although Defendant did not initiate contact with authorities, he answered the questions asked of him, and the Court finds this factor to be neutral.  The lone factor weighing against custody is that Special Agent Nichols employed no strong-arm or deceptive tactics.  After considering all the Griffin factors and viewing the situation from the perspective of a reasonable man in Defendant's position, the Court concludes that Defendant would have believed that his freedom of action was restricted to a degree tantamount to a formal arrest.

Having found that Defendant was interrogated in a custodial setting, the Court now turns to the Government's principal argument—that Defendant's statement is admissible despite the absence of a Miranda warning under the public safety exception to the Miranda rule.  In New York v. Quarles, 467 U.S. 649 (1984), the United States Supreme Court established an exception to the Miranda advisory requirement when "police officers ask questions reasonably prompted by a concern for the public safety."  Id. at 656.  The availability of the public safety exception "does not depend upon the

7

motivation of the individual officers involved." Id. at 656.

The Government relies on two Eighth Circuit cases in support of its position:  United States v. Williams, 181 F.3d 945 (8th Cir. 1999), and United States v. Luker, 395 F.3d 830 (8th Cir. 2005). In Williams, the defendant was suspected of engaging in narcotics trafficking from his apartment.  181 F.3d at 947.  The police obtained a warrant to search the apartment and used a flash-bang device in entering.  Id. at 947-48.  Approximately six officers entered the apartment, found the defendant lying on his bed, and handcuffed him.  Id. at 948.  One of the officers asked Defendant, with no Miranda warning, "[i]s there anything we need to be aware of?"  Id.  The defendant responded that there was a gun in the closet.  Id.  The Eighth Circuit found the statement admissible under Quarles because "public safety concerns were an issue in this case."  Id. at 953.  While the court acknowledged that the defendant's hands were cuffed behind his back, the court nonetheless found a real concern for public safety because the officers

> could not have known if any armed individuals were present in the apartment or
> preparing to enter the apartment within a short period of time.  Similarly, the officers
> could not have known whether other hazardous weapons[] were present in the
> apartment that could cause them harm if they happened upon them unexpectedly or
> mishandled them in some way.

Id.

In Luker, the defendant's vehicle was stopped by the police for having an excessively loud muffler.  395 F.3d at 831-32.  The defendant failed a field sobriety test and was arrested for drunk driving.  Id. at 832.  Because the officer knew the defendant had a history of methamphetamine use, he asked the defendant if there was anything on his person that could stick or poke the officer during a pat-down search.  Id.  The officer then asked the defendant if there was anything in his car that should

not be there or that the officer should know about.  Id.  The defendant replied that he had a shotgun in

his car.  Id.  The defendant had not been Mirandized before making this statement.  Id.  The Eighth

Circuit found that the statement was admissible under Quarles and Williams because "the officers were

aware of Luker's history of methamphetamine use and were concerned about needles or substances

associated with such use in the car and thus the question concerning the contents of the vehicle was

warranted."  Id. at 833-34.

     The case at hand is distinguishable from both Williams and Luker.  The very first reason given in

Williams in finding a public safety concern was the possibility that armed individuals were also in the

apartment.  That concern is simply not present here.  Special Agent Nichols knew that there were no

other individuals in the apartment, much less armed individuals, because the apartment had been

secured by the SWAT team.  Also, there is no evidence that Special Agent Nichols, or any other agent,

thought that other people were preparing to enter the apartment, as was the case in Williams.  To the

contrary, given the time taken by the SWAT team to secure the apartment and the number of officers

involved, it was highly unlikely that anyone was going to attempt to enter.  Finally, the phrasing of the

officer's question in Williams is meaningfully distinct from that of Special Agent Nichols.  The officer in

Williams asked whether there was anything the officers needed to be aware of; "anything" meaning guns

as well as "other hazardous weapons."  181 F.3d at 954.  "Hazardous weapons" includes not only guns

but also explosive devices and other types of firearms.  Id. at 954 n.14.  The inclusive nature of the

phrase "hazardous weapons" correlates to a real concern for public safety, as it would protect the

public and officers from all types of harmful weapons.  In contrast, Special Agent Nichols only asked

Defendant about guns, which undercuts  his purported concern for public safety.  If Special Agent

Nichols had really meant to ensure public safety, he would have asked about <u>all</u> hazardous weapons, not just guns.  His narrowly phrased question indicates that his concern was not for public safety, but for obtaining evidence against Defendant.  This is confirmed by the fact that, although he mentioned public safety secondarily, when asked why he inquired of Defendant, he testified that he asked the question because "that was the purpose of our search warrant."

<u>Luker</u> is also distinguishable from the present case.  In <u>Luker</u>, the police stopped a vehicle for a traffic offense.  Unlike the situation before the Court, where the SWAT team secured Defendant's residence before the question was asked, the officers in <u>Luker</u> did not know what unsafe conditions might exist inside the car.  In addition, the officers' suspicion in <u>Luker</u> was prompted by a fear that needles could stick or poke them or that hazardous chemicals could injure them while they searched the car, based on the defendant's history of methamphetamine use.  Here, on the other hand, there was no reason to believe that Defendant was concealing hazardous chemicals or needles, both of which can cause injury by the slightest contact.  Finally, the question posed to the defendant in <u>Luker</u> was as broad as the question in <u>Williams</u>, which demonstrated a real concern for any type of hazardous or unsafe condition, as compared to the question posed by Special Agent Nichols, which targeted only the suspected gun.

The Court acknowledges that there are some similarities between the case at hand and <u>Williams</u> and <u>Luker</u>, such as the fact that the defendants were already restrained at the time of the questioning.  However, the cases are sufficiently distinguishable to preclude application of the public safety exception to this case.  Here, the SWAT team had already secured the residence, and Defendant was restrained.  There was no reason to believe that any armed or dangerous person was preparing to approach the

10

secured scene.  Finally, the officer did not inquire about any hair-triggered weapons, dangerous traps, or other hazardous items in the apartment.  If the public safety exception were to apply under these circumstances, then the exception would swallow the rule and be applicable to any situation in which the police thought there might be a gun.  This simply cannot be the case, as it would eliminate the Miranda requirement in all searches targeting or otherwise involving a gun.

Special Agent Nichols' question to Defendant about the existence of any guns in the apartment was simply not "necessary" to secure the safety of the officers.  See Quarles, 467 U.S. at 659 (emphasis added).  There was no "objectively reasonable need to protect" them "from an immediate danger associated with the weapon."  See id. at 659 n.8.  The SWAT team had fully secured the premises, and Defendant was restrained.  The Court therefore concludes that the question was not reasonably prompted by public safety concerns, and Defendant's response should be suppressed.

### 3.      Defendant's Statement to Special Agent Nichols at the Jail

Defendant relies on Missouri v. Seibert, 542 U.S. 600 (2004), as a basis to suppress his statement made at the jail.  In Seibert, a divided Supreme Court determined that a Miranda warning given between two interrogation sessions was not sufficient to fully advise a suspect of his Miranda rights and render the second statement admissible.  The plurality listed several factors to be considered in determining whether to admit the post-Miranda statement: "the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." Id. at 615.  In addition, the Eighth Circuit treats as controlling Justice Kennedy's concurrence in Seibert

11

and imposes an additional requirement that the interrogating officer must have intentionally used a two-step interrogation process in order to circumvent <u>Miranda</u>. <u>See</u> <u>United States v. Torres-Lona</u>, 491 F.3d 750, 757-58 (8th Cir. 2007) (citing <u>Seibert</u>, 542 U.S. at 622 (Kennedy, J., concurring)). If there is no such "calculated effort" by the officer, the question of admissibility is governed by <u>Oregon v. Elstad</u>, 470 U.S. 298 (1985). <u>Torres-Lona</u>, 491 F.3d at 757-58.

Here, there is absolutely no evidence that Special Agent Nichols intentionally used a two-step interrogation process in order to circumvent <u>Miranda</u>. The Court therefore turns to <u>Elstad</u> to determine the admissibility of the second statement. A statement made after a <u>Miranda</u> warning is admissible as long as it was made knowingly and voluntarily. <u>Elstad</u>, 470 U.S. at 309. Here, there is no evidence whatsoever that Defendant's statement at the jail was anything other than voluntary and knowing, and Defendant does not argue this point. Accordingly, the second statement should not be suppressed.[3]

Based on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

---

[3] If the Court continued with the <u>Seibert</u> factors, the second statement would be deemed admissible. The initial interrogation consisted of very few questions, and all but one were biographical in nature. Other than the biographical information given, the content of the two statements did not overlap. The only substantive question in the first round of questioning concerned the existence of guns in the apartment. There is no evidence that this question was repeated during the second round, which focused on the state drug charges, federal gun charges, and immigration charges that Defendant was facing, as well as details about the recovered gun. The first and second statements were interrupted by a period of time, and Defendant was removed to a different setting. Although Defendant remained in police custody, Special Agent Nichols was not present throughout the transport and booking process. Finally, there is no evidence that Special Agent Nichols treated the second round of questioning as continuous with the first.

1.      Defendant's Motion to Suppress Evidence Obtained as a Result of May 16, 2007

Search (Doc. No. 27) be **DENIED**; and

2.      Defendant's Motion to Suppress May 16, 2007 Statements (Doc. No. 28) be

**GRANTED** as to Defendant's response to Special Agent Nichols' question

concerning the existence of any guns, and **DENIED** in all other respects.


Dated: <u>September 24, 2007</u>

   <u>s/ Susan Richard Nelson</u>
SUSAN RICHARD NELSON
United States Magistrate Judge


Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing
with the Clerk of Court, and serving all parties by **October 9, 2007,** a writing which specifically
identifies those portions of this Report to which objections are made and the basis of those objections.
Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek
review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days
after service thereof.  A judge shall make a de novo determination of those portions to which objection
is made.  This Report and Recommendation does not constitute an order or judgment of the District
Court, and it is therefore not appealable to the Court of Appeals.